1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney

2

3  HALLIE HOFFMAN (CABN 210020)
   Chief, Criminal Division

4  BENJAMIN KINGSLEY (CABN 314192)
   ERIC CHENG (CABN 274118)

5  Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495

7       Telephone: (415) 436-7200
        FAX: (415) 436-7234

8       benjamin.kingsley@usdoj.gov
        eric.cheng@usdoj.gov

9

   Attorneys for United States of America

10
                    UNITED STATES DISTRICT COURT

11
                  NORTHERN DISTRICT OF CALIFORNIA

12
                     SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,            )   Case No. CR 21-0011 WHA
                                         )
15            Plaintiff,                  )   UNITED STATES' OPPOSITION TO
                                         )   DEFENDANT'S MOTION TO EXCLUDE JULY
16       v.                               )   13, 2020 INTERVIEW
                                         )
17  CHEN SONG,                            )   Hearing Date:    May 19, 2021
            a/k/a SONG Chen,              )   Hearing Time:    8:00 a.m.
18                                        )
            Defendant.                    )   Court:           Hon. William Alsup
19                                        )
    _____)

20

21

22

23

24

25

26

27

28

U.S. OPP. TO DEF. MOT. TO EXCLUDE
CR 21-0011 WHA

**TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................................................1

II.  FACTUAL BACKGROUND ...............................................................................................3

    A.  July 13, 2020: Arrival .............................................................................................4

        1.  Knock-and-Announce .................................................................................4

        2.  Initial Conversation on Front Porch ..........................................................4

        3.  Protective Sweep .......................................................................................5

    B.  July 13, 2020: Search and Interview ......................................................................6

        1.  Interactions in the House Before the Interview ........................................6

        2.  First Session of Defendant's Interview .....................................................8

        3.  Sulan Wang Interview ..............................................................................10

        4.  Between the Two Sessions of Defendant's Interview ..............................11

        5.  Second Session of Defendant's Interview ...............................................12

        6.  Atmosphere of Search and Interview ......................................................13

III.  ARGUMENT .....................................................................................................................13

    A.  Legal Background ..................................................................................................13

    B.  Defendant's Motion Lacks Factual Support .........................................................15

    C.  Defendant's Interview Statements Were Voluntary and Non-Custodial ...........................17

        1.  Two Agents in Business Attire Without Visible Firearms Interviewed Defendant While Six Agents Conducted a Professional Search Warrant Execution Elsewhere in the Home .........................................................17

        2.  Defendant Was Not Restrained or Detained by Any Force or Threats.................20

        3.  Defendant Was Never "Isolated" From Her Daughter .........................................22

        4.  Agents Repeatedly Informed Defendant She Was Not Under Arrest and Any Interview Was Voluntary .......................................................24

IV.  CONCLUSION..................................................................................................................25

**TABLE OF EXHIBITS**

**Exhibit**

1. Declaration of AUSA Eric Cheng

2. Declaration of Special Agent Blalock, Joyce

3. Declaration of Special Agent Fokas, Spiro

4. Declaration of Special Agent Hernandez, Adelaida

5. Declaration of Special Agent Thomas, Geoffrey

6. Declaration of Special Agent Trott, Jennifer

7. Declaration of Special Agent Wu, Letitia

8. Declaration of Special Agent Yu, Mindy

9. Declaration of Victim Specialist Jennifer Wang

**Exhibit**

A. Audio recording provided by the FBI regarding the July 13, 2020 interview of defendant (first session) (Blalock) (SONG-000168.0002, provided by disc)

B. Audio recording provided by the FBI regarding the July 13, 2020 interview of defendant (first session) (Fokas) (SONG-000169.0002, provided by disc)

C. Audio recording provided by the FBI regarding the July 13, 2020 interview of defendant (second session) (SONG-000169.0003, provided by disc)

D. FBI Transcript regarding the July 13, 2020 interview of defendant (first session only) (Blalock) (SONG-011149 – SONG-011191)

E. FBI Transcript regarding the July 13, 2020 interview of defendant (Fokas) (SONG-011089 – SONG-011148)

1

## <u>TABLE OF AUTHORITIES</u>

2   *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ..................................................... 14, 15, 17, 21

3   *Stansbury v. California* ........................................................................................................ 14

4   *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) .................................................................. 14

5   *United States v. Acosta-Licerio*, 756 F. App'x 743, 744 (9th Cir. 2019) ............................. 19

6   *United States v. Atkins*, No. 15-cr-00506-BLF-1, 2017 WL 2652873, at *9
     (N.D. Cal. June 19, 2017) ................................................................................................. 22
7
  *United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009) ........................................... 22
8
  *United States v. Clymer*, 524 F. App'x 354, 355–56 (9th Cir. 2013)
9     (unpublished disposition).................................................................................................... 18

10   *United States v. Craighead*, 539 F.3d 1073, 1083 (2008) .............................................. passim

11   *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc)................... 14, 22

12   *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001).................................... passim

13   *United States v. McKany*, 649 F. App'x 553, 554–55 (9th Cir. 2016) ................................. 18

14   *United States v. Mora-Alcaraz*, 986 F.3d 1151 (9th Cir. 2021).......................................... 22

15   *United States v. Ornelas*, No. SACR 14-00183-CJC, 2016 WL 5422034,
     at *9 (C.D. Cal. Sep. 27, 2016)........................................................................................ 23
16
  *United States v. Quackenbush*, 728 F. App'x 777, 778 (9th Cir. 2018)
17     (unpublished disposition)....................................................................................... 14, 19, 21, 25

18   *United States v. Remy*, 393 F. App'x 427, 429 (9th Cir. 2010)
     (unpublished disposition).................................................................................................... 20
19
  *United States v. Tobie*, 411 F. App'x 995, 996 (9th Cir. 2011).......................................... 21

20

21

22

23

24

25

26

27

28

## I.    **INTRODUCTION**

On the morning of July 13, 2020, defendant Chen Song was interviewed inside her Newark residence in an unlocked first-floor bedroom by two FBI agents in business attire, without any visible firearms, over two voluntary sessions, before and during which she was repeatedly informed she was not in custody and that her participation in the interviews was entirely voluntary.  Her daughter—who defendant freely checked on both immediately before and after the first session of the interview which began at about 6:18 a.m.—was soundly asleep by herself in an upstairs bedroom throughout the entirety of this first 53-minute session.  Defendant and the two interviewing agents spoke in a bedroom that defendant agreed to while the execution of a federal search warrant was conducted elsewhere in the house by six FBI agents in nontactical, clearly-marked FBI clothing, during which firearms were not unholstered (or generally even visible) following a knock-and-announce and momentary protective sweep of the home at the outset for safety, pursuant to FBI protocols.

After the first session of the interview, defendant went upstairs to get her daughter ready, and then brought her daughter downstairs to set her up in the kitchen with an iPad and activities for distance learning while defendant prepared breakfast.  For about an hour, defendant remained with her daughter while her daughter played with an iPad or toy and colored, as agents conducted the search other places in the house.  As the agents were wrapping up their search, they asked if defendant was available to speak with the two interviewing agents again, which she agreed to do.  Defendant returned to the same unlocked bedroom with them for the second session of the interview, which began at about 9:12 a.m. and lasted about 24 minutes.  As the second session began, in response to an agent's question about how her daughter was doing, defendant even remarked that her daughter was "okay because [she] didn't tell her what happened" and "just let her play."  Throughout the events of that day, defendant was ***never*** placed in handcuffs, moved freely between various rooms and areas upstairs and downstairs of the home, and was ***repeatedly advised*** by agents in English and in Chinese that she was not under arrest and that any interview of her was voluntary.  Indeed, defendant herself acknowledged during the interview sessions, in English, that she was not under arrest and that she need not answer questions.

Despite the demonstrably non-custodial nature of defendant's voluntary interview sessions with the FBI, defendant submitted a "motion in limine to exclude" her July 13, 2020 statements and sought

1    an evidentiary hearing on the eve of the previously-scheduled trial date.  Dkt. 87 ("Motion" or "Mot.").

2    In reality, the Motion is a faintly disguised motion to suppress[1] defendant's statements that inaccurately

3    attempts to cast a voluntary, non-custodial interview as a custodial interrogation.

4         The Motion lacks any factual or legal basis.  It fails to attach the actual audio-recordings of the

5    precise interview sessions defendant is seeking to exclude, which are the best evidence of what

6    happened during the interview and demonstrate the voluntariness of the calm, low-intensity interview

7    sessions.  Instead of relying on the actual interview recordings, it is primarily supported by two

8    declarations.  One is a  declaration of one of defendant's four defense attorneys based on his own review

9    of the recordings and which fails to describe fundamental aspects of the interview—such as defendant's

10   obvious ability to communicate in English and laughter throughout—while omitting the actual reason

11   for the one time defendant became emotional throughout both interview sessions (that is, the very

12   substantial effects of the COVID-19 pandemic on her as a working parent).  The second is a declaration

13   of a family member, Sulan Wang who though in the house initially was not actually present for the

14   interview sessions or the vast majority of the relevant interactions that day.  In fact, Wang was free to

15   leave—and did in fact leave—the residence for work at around 7:30 a.m..  Wang was thus was not even

16   at the residence for the intervening time between the first and second interview sessions—during which

17   defendant and her daughter were together in the kitchen for breakfast and distance learning—and she

18   had left long before defendant agreed to another interview.  As a result, the Motion lacks basic facts that

19   would be required to properly support the Motion, and is replete with omissions that, if included, would

20   have accurately described the actual events of the day and shown the unmistakably non-custodial nature

21   of the defendant's interview sessions.

---

[1] The normal practice for filing a motion to suppress a defendant's interview statements would be a pretrial motion to suppress that gives the Court sufficient time to consider a potentially fact-laden inquiry, not a motion *in limine* filed shortly before trial requesting an evidentiary hearing two days before trial.  Nonetheless, defendant filed this motion shortly before trial as a motion *in limine* after agreeing that she would not file any pretrial motions if the government consented to a speedy bench trial, which the government did.  *See* Joint Status Statement (Feb. 9, 2021), Dkt. 52 ("If the government [consents to a bench trial], Dr. Song will agree not to file any pretrial motions, including discovery motions or motions challenging the pleadings, although she will reserve the right to file motions in limine or motions challenging expert testimony.").  Of course, with the government's appeal regarding the Classified Information Procedures Act pending, the Court has sufficient time to consider the motion, and defendant's delay in bringing this Motion is now moot.

1    At bottom, the interview of defendant by two agents wearing suits, without firearms visible, at

2  defendant's home in a room agreed to by defendant, in the midst of a professionally executed FBI search

3  pursuant to a federal warrant, in which defendant was never handcuffed, was repeatedly told (and in fact

4  at one point acknowledged) she was not in custody and that the interview was voluntary, was clearly

5  constitutional.  Defendant's Motion should be denied without an evidentiary hearing.

6  **II.    FACTUAL BACKGROUND**

7    On July 10, 2020, the government obtained a search warrant signed by Magistrate Judge Sallie

8  Kim authorizing the search of Sulan Wang's home in Newark, CA, where defendant resided with her

9  daughter and Wang, who is defendant's aunt.  (Mot., Ex. A.)  The search warrant authorized the search

10  and seizure of the home for evidence of defendant's suspected visa fraud.  *Id.*  No arrest warrant was

11  sought or obtained at this time.

12    On July 13, 2020, at or about 6:00 a.m., the FBI executed the search warrant at that residence,

13  following standard FBI procedures and protocols.  (Ex. A.)  On the actual search team, six of them were

14  armed agents.  (*See, e.g.*, Ex. 2, Blalock Decl. ¶ 3; Ex. 5, Thomas Decl. ¶ 6.)  An unarmed Victim

15  Specialist (VS), Jennifer Wang joined to support the search; she is trained in, among other things,

16  comforting civilians, including children, in difficult situations.  (Ex. 9, VS Wang Decl. ¶ 1.)  She speaks

17  Mandarin Chinese and was brought by the FBI to this search specifically to help care for defendant's

18  daughter during the search, and she spoke Chinese with defendant and her daughter during the search.

19  (VS Wang Decl. ¶ 2.)  The two interviewing agents remained in the car and did not participate in the

20  entry or the execution of the search; they only entered the home for the interview, dressed in business

21  attire without firearms visible, after the house was cleared and the search had begun.  (Blalock Decl.

22  ¶¶ 3–4; Ex. 3, Fokas Decl. ¶ 2.)  In total, nine FBI employees were present that day.  Of the eight agents

23  (including the two interviewing agents) who were present, six were female, and three of those female

24  agents (SA Letitia Wu, SA Joyce Blalock, and Supervisory SA (SSA) Jennifer Trott) speak some level

25  of Mandarin Chinese, in addition to VS Wang.  All three of these Chinese-speaking agents and VS

26  Wang also spoke Chinese at various points that day.  (Blalock Decl. ¶ 13; Ex. 7, Wu Decl. ¶¶ 7, 11, 16–

27  17; Ex. 6, Trott Decl. ¶ 2; VS Wang Decl. ¶ 2.)

28  //

### A.      July 13, 2020: Arrival

#### 1.      Knock-and-Announce

At about 6:00 a.m. on July 13, 2020, SA Geoff Thomas and SA Letitia Wu followed standard FBI operating protocol in knocking-and-announcing at the front door along with the four other agents conducting the search.  (Thomas Decl. ¶ 2; Wu Decl. ¶ 3.)  For safety, the agents at the front door had their firearms drawn for the initial knock-and-announce, but not pointed at anyone—either during the knock-and-announce or any other time of the search.  (Ex. 4, Hernandez Decl. ¶ 4; Thomas Decl. ¶ 2; Wu Decl. ¶ 3; Ex. 8, Yu Decl. ¶ 3.)  SA Thomas brought the smallest authorized duty firearm on the search, as opposed to other firearms he brings on duty on other operations, which are larger and more visible.  (Thomas Decl. ¶ 2.)  The six agents at the door were wearing typical FBI windbreakers with the letters "FBI" on them, which generally cover their firearms while holstered.  (Thomas Decl. ¶ 6; Trott Decl. ¶ 5; Wu Decl. ¶ 8; Yu Decl. ¶ 5.)  They also wore soft body armor underneath the jackets, which looks like a vest.  (Hernandez Decl. ¶ 3; Thomas Decl. ¶ 5; Trott Decl. ¶ 3; Wu Decl. ¶ 8; Yu Decl. ¶ 3.)

They knocked on the front door, announced that they were the FBI executing a search warrant, and then waited for someone to open the front door.  (Thomas Decl. ¶ 2; Wu Decl. ¶ 3.)  It took a short period of time for someone to answer the front door, and during that time agents knocked-and-announced one or more times.  *Id.*  The door was opened and answered by Sulan Wang, who was dressed in sleep attire.  *Id.*  Wang was requested, in English, to step outside, which she did.  (Thomas Decl. ¶ 3; Wu Decl. ¶ 4.)  Wang was asked, in English, if defendant was in the house; Wang confirmed yes, in English, and called upstairs for defendant.  *Id.*  Defendant shortly thereafter emerged from a bedroom upstairs, also in sleep attire, and came downstairs to the front door.  *Id.*

#### 2.      Initial Conversation on Front Porch

At the front door, defendant, in English, requested that the agents be quiet, because her daughter was still sleeping.  (Wu Decl. ¶ 4; Thomas Decl. ¶ 3.)  Agents complied with that request.  (Thomas Decl. ¶ 4.)  As discussed below, during this time, a subset of the agents entered the home to conduct a protective sweep.

Neither Wang nor defendant were ever placed in handcuffs or restrained physically or by threats in any manner.  (Wu Decl. ¶ 6; Yu Decl. ¶ 4.)  FBI standard operation procedure generally would call

1   for the handcuffing of all occupants of a residence until the residence is cleared, but agents did not do so

2   during this search.  (Wu Decl. ¶ 6.)  At no point was a firearm ever pointed at either Wang or defendant.

3   (Hernandez ¶ 4; Wu Decl. ¶ 4; Yu Decl. ¶ 3.)

4          During this time, SA Wu spoke to Wang and defendant on the front porch, as observed by other

5   agents present.  (Trott Decl. ¶ 4; Yu Decl. ¶ 4.)  SA Wu holstered her firearm before speaking to Wang

6   and defendant, and she stood only between Wang and defendant and the door while the house was

7   cleared.  (Wu Decl. ¶ 6.)  Defendant asked SA Wu, in English, what was happening; SA Wu responded,

8   in Mandarin Chinese, that they were with the FBI, and that they were executing a search a warrant;

9   defendant asked, in Chinese, what this was about; SA Wu, in Chinese, responded that they would

10  explain and asked if there was a male inside the house; they responded no.  (Wu Decl. ¶ 7.)  During this

11  brief conversation, Wang complained that it was early.  *Id.*

12         The agents did not observe Wang or defendant to be upset or agitated at this time; instead, they

13  both seemed, unsurprisingly, tired.  (Trott Decl. ¶ 3; Wu Decl. ¶ 7.)

14                    **3.    Protective Sweep**

15         While both Wang and defendant were outside on the porch, a subset of the agents entered the

16  house to conduct a protective sweep to clear the house and ensure there were no other individuals

17  (beyond defendant's sleeping daughter) present inside.  (Hernandez Decl. ¶ 3; Thomas Decl. ¶ 4; Wu

18  ¶ 5.)  Surveillance on July 12, 2020 had identified an unknown male in the household with defendant

19  and her daughter.  (Blalock Decl. ¶ 2; Wu Decl. ¶ 2.)  As a result, for safety and pursuant to FBI

20  standard operating protocols, the agents needed to make sure no other occupants were unaccounted for

21  in the house.  (Thomas Decl. ¶ 4; Wu Decl. ¶ 5.)  During the sweep, agents encountered no other

22  individuals in the home.  (Thomas Decl. ¶ 4.)  Again pursuant to FBI operating protocols, those agents

23  inside the house had their firearms drawn but not pointed during this protective sweep.  *Id.*

24         One of the agents, SA Thomas, found the daughter's bedroom during the sweep; he walked very

25  quietly into the bedroom, saw the daughter was asleep, and walked deliberately quietly out without

26  waking her.  (Thomas Decl. ¶ 5.)  The daughter remained asleep.  *Id.*

27         The entire protective sweep lasted only a few minutes.  (Thomas Decl. ¶ 4; Wu Decl. ¶ 5.)  After

28  the house was cleared, all other firearms not already holstered were holstered by the agents at that point,

and not taken out again during the remainder of the operations that day.  (Hernandez Decl. ¶ 3; Thomas Decl. ¶ 5; Trott Decl. ¶ 3; Wu Decl. ¶ 5; Yu Decl. ¶ 3.)  Shortly after the sweep was completed, the agents removed their soft vests.  (Hernandez Decl. ¶ 3; Thomas Decl. ¶ 5; Trott Decl. ¶ 3; Wu Decl. ¶ 8; Yu Decl. ¶ 3.)

At or around the end of the process, a neighbor, who had been watching from in front of his house, self-identified to the agents as a lawyer and complimented the agents on their professionalism. (Hernandez Decl. ¶ 5; Wu Decl. ¶ 10.)

### B.    July 13, 2020: Search and Interview

After the protective sweep, which lasted only a few minutes, the FBI employees entered the house with Wang and defendant to proceed with the search.  As discussed above, no firearms were ever unholstered in the house with Wang and defendant inside, and the FBI jackets generally cover their holstered firearms.

### 1.    Interactions in the House Before the Interview

Once inside the house, defendant went upstairs to check on her daughter. (Wu ¶ 9.)  After defendant returned downstairs, and as the search proceeded, SA Wu said to defendant in Chinese that they had a couple of questions if she didn't mind, and she agreed. (Wu ¶ 11.)  SA Fokas and SA Blalock came into the house for the interview.  (Blalock ¶ 5; Fokas ¶ 4.)  Both were dressed in business suits.  Both were carrying concealed firearms in waistband holsters that were not visible under their suit jackets, and would not have been seen by defendant.  (Blalock ¶ 4; Fokas ¶ 3.)  Neither removed their firearms from the holsters or from beneath their jackets.  *Id.*

As SA Fokas and SA Blalock entered, they turned on their audio-recording devices, and the recordings of their interactions with defendant begin at that time.  (Blalock ¶ 6; Fokas ¶ 5.)  These recordings are attached here as Exhibits A & B (first session), and C (second session).  SA Fokas, in English, introduced himself and SA Blalock to defendant, and then asked if there was somewhere to talk privately, instead of where the agents might be conducting the search.  Dkt. 87-2 at 7.

Meanwhile, FBI VS Wang was upstairs outside defendant's daughter's room, watching the daughter through a partially open door.  (VS Wang Decl. ¶ 3.)  The daughter was still asleep.  *Id.* Agents were keeping quiet and being respectful around her bedroom despite other doors being open

during the search.  *Id.*

Right before the first session of the interview began, defendant asked to get dressed and check on her daughter, which SA Fokas and SA Blalock immediately told her she could do and she then left for about five minutes.  (Blalock Decl. ¶ 5; Fokas Decl. ¶ 4.)  The interactions are reported as partially unintelligible on the court reporter version of the transcript that the government obtained for trial (*see* Dkt. 87-2 at 7), but it is clear what happened from the audio-recordings and a separate, earlier-prepared FBI version of the transcript.  (Ex. A at 3:05–3:32; Ex. B at 3:29–3:57; Ex. E at 2.)  Defendant stated, in English, that she wanted to get dressed.  SA Fokas, in English, immediately said, "Of course. Yes, okay."  Defendant then said, "Yeah and let me check my daughter."  In response, both SA Blalock and SA Fokas immediately said that she could.  *Id.*

Immediately thereafter, defendant and SA Wu went upstairs, and defendant went to check on her daughter.  (Blalock Decl. ¶ 5; Fokas ¶ 4; Wu Decl. ¶ 13.)  There is a five-minute silence on the recordings during that time.  (*See* Ex. A. at 3:32; Ex. B at 3:57.)  Only defendant went into the bedroom to check on her daughter.  (Wu Decl. ¶ 13.)  Her daughter did not wake up, and remained asleep during this time.  *Id.*  After checking on her daughter, defendant exited the daughter's room, and went into her own bedroom, which is also upstairs.  She went inside her room, by herself, and changed.  SA Wu stood at the doorway to follow standard FBI operating procedures but did not watch defendant change.  *Id.*

While defendant was still in her room, folding clothes, she asked SA Wu whether she was under arrest.  (Wu Decl. ¶ 13.)  SA Wu responded no and referenced the search warrant, and further explained that it was about her visa.  *Id.*  Defendant responded that she was just a scholar at Stanford on a certain kind of visa and that she was a neurologist.  *Id.*  SA Wu went on to state, in Chinese, that colleagues downstairs had questions for her.  *Id.*  In response, defendant stated that she had rights and SA Wu responded, in Chinese, that she knew and that defendant was not required to talk to them, but that it might be helpful.  *Id.*  Defendant said "OK."  *Id.*  During this exchange, defendant did not appear scared or agitated at all.  *Id.*

After defendant finished changing, SA Wu asked defendant, in English, if she needed to be anywhere that day.  (Wu Decl. ¶ 14.)  Defendant referenced Stanford's closure, that her child had school, and she preferred not to drive, suggesting she had nowhere to go that day.  *Id.*

1   Defendant then went back downstairs to interview room.  *Id.*  The interview with the two agents

2   in the downstairs bedroom is captured by the audio-recordings of the two recording devices.  (*See*

3   *generally* Ex. A & B; Ex. E.)  Nowhere in these interactions did defendant express any interest in

4   leaving the home in which her daughter was soundly sleeping, nor did the agents direct her where to go

5   or what to do during this time.

### 2.   First Session of Defendant's Interview

7   The interview took place in the first-floor bedroom that defendant had found agreeable to talk,

8   and she seemed calm and collected when she entered the room.  (Trott Decl. ¶ 6.)  The door was closed

9   but unlocked.  (Blalock Decl. ¶ 5; Fokas Decl. ¶ 4.)  The chairs were arranged around a bed in the

10  middle of the room such that defendant could face both of them.  *Id.*  Of the three chairs in the room, SA

11  Blalock's chair was closest to the door, but they were all casually seated and SA Blalock in no way

12  appeared to be standing guard to block the door.  *Id.*

13  The initial interview lasted approximately 53 minutes, beginning at approximately 6:18 a.m. and

14  ending shortly before 7:11 a.m.  (Ex. E at 2, 40.)  The interview was conducted in English, with the

15  exception of SA Blalock's occasional reference to certain phrases in Mandarin Chinese.  (Blalock Decl.

16  ¶ 7; Fokas Decl. ¶ 6.)  Defendant's English language fluency was apparent to the interviewing agents

17  and is also readily apparent from the audio-recording of both interviews, as defendant repeatedly

18  coherently responds to and discusses complex topics in English.  (Blalock Decl. ¶ 7; Fokas Decl. ¶¶ 6–

19  7.)  On the instances when she did not understand a question, she asked for clarification or asked for a

20  question to be repeated, and the agents provided it.  *Id.*; *see also, e.g.*, Dkt. 87-2 at 5 (first session); Dkt.

21  87-2 at 61 (second session).  Over the course of the interview, defendant calmly explained her career

22  path (*see, e.g.*, Dkt. 87-2 at 10–11, 28–36), her time in the United States (*see, e.g.*, Dkt. 87-2 at 11–18),

23  and various other topics, including with periodic laughter throughout (*see, e.g.*, Ex. E at 8, 17, 20).  The

24  calm demeanor and laughter was observed by multiple agents outside the room as they proceeded with

25  the search.  (Trott Decl. ¶ 8; Yu Decl. ¶ 7.)  She also calmly and repeatedly explained that she had no

26  ongoing or recent affiliation with the People's Liberation Army (PLA).  (Blalock Decl. ¶ 8; Fokas Decl.

27  ¶ 7; *see, e.g.*, Dkt. 87-2 at 11, 36, 41.)

28  SA Fokas began the interview with a lengthy apology, explaining "apologize for meeting like

this.  I know this is very jarring, this is very unnerving to you.  I understand completely and we do apologize for that." Dkt. 87-2 at 7–8.  SA Fokas continued, "[y]ou're a visitor in this country.  This isn't something you expected to happen and – and we do understand how difficult this probably is for you." Dkt. 87-2 at 8.  SA Fokas then explained that the search and interview were about more than the defendant herself, as they had found that "a number of visiting scholars from your particular institute that are here in the U.S. right now who have either lied or misled about what institute they're affiliated with," and that they were trying to find out "why exactly there are so many people here and that are lying about – about the reasons for being here or where they're from." Dkt. 87-2 at 9.  He again emphasized that the investigation "isn't so much about you, per se" but instead was part of "trying to understand exactly how you fit into this broader investigation." Dkt. 87-2 at 10.  Instead, SA Fokas explained, they were "trying to understand why – why there are so many from that hospital here in the U.S. right now who have misled where they're actually – who they actually work for and their affiliations." Dkt. 87-2 at 10.

During the course of this initial interview, defendant was again repeatedly told she was not under arrest and that the interview was voluntary.  Defendant, at one point, said "I'm a little bit scared."  In response, SA Fokas said, "Make something very, very clear.  You're not under arrest.  That's not why we're here, okay." Dkt. 87-2 at 42.

Shortly afterwards, defendant acknowledged that she knew she was not under arrest and had a right to remain silent, stating: "I just want to know my rights.  I mean, this is not arrest.  I think I have some personal rights, right?" Dkt. 87-2 at 45.  SA Fokas responded, "Sure," as defendant said, "Including keep silent.  Right?" Dkt. 87-2 at 45.  SA Fokas then responded and told defendant, again, exactly what her rights were: "If we were arresting you, you would have – if we were arresting you, the first thing we would have said to you is – we would have read you your rights." Dkt. 87-2 at 45.  SA Fokas continued, "We would have said you do have the right to remain silent."

SA Fokas went on to emphasize here: "This is completely voluntary.  You do not have to talk to us right now.  That's fine.  And if that's what you want to do, that would be fine."  SA Fokas again said later, "And that's fine.  That's your decision." Dkt. 87-2 at 45.  Again shortly after this, SA Blalock stated: "It is up to you whether you want to talk or not.  We're not forcing you to.  Like Spiro said, it is

voluntary." Dkt. 87-2 at 46.  And yet again, SA Fokas, shortly afterwards, said: "So you are under no

obligation to talk to us.  You are not under arrest, you are not.  But based on what you've told us now,

based on where we are with kind of this revelation, I do think you're lying to us.  And lying to an FBI

agent is a crime, okay?  That is a crime." Dkt. 87-2 at 48.  Defendant then, again, having been informed

repeatedly that she was not under arrest and did not have to speak with the agents, again stated that she

had no affiliation to the military.  Dkt. 87-2 at 49.

At the end of the first session of the interview, SA Fokas explained that he and SA Blalock were

going to "step away." Dkt. 87-2 at 48.  He stated that they would remain nearby and that the other

agents would continue the search.  *Id.*  He explicitly stated that defendant was "welcome to leave,

welcome to stay," and that he and SA Blalock were happy to come back and talk to her more.  Dkt. 87-2

at 48–49.  Defendant stated that she was afraid for her daughter.  *Id.*

Defendant asked SA Fokas and SA Blalock if she "[c]an I check on my daughter?"  (Ex. E at 40;

Ex. B at 1:01:20–1:02:07.)  SA Fokas responded that she could, but that he asked her to "[h]ang on one

second" so he could "make sure that uh we figure out where everyone is.  I don't want to surprise

anybody." *Id.*  Defendant asked again, and SA Fokas confirmed within seconds that defendant could go

upstairs without surprising anyone, and told her she could go upstairs.  *Id.*  Defendant headed upstairs

within less than a minute of first asking to check on her daughter.  (*Id.*; Fokas Decl. ¶ 4.)  The recording

devices stop at around this time, shortly after 7:15 a.m., before restarting during the follow-up interview

1 hour and 45 minutes later.

Defendant at that point went upstairs to wake her daughter up and get her ready.  (Trott Decl.

¶ 7; VS Wang Decl. ¶¶ 4–5.)  The daughter was not "crying and crouched near a trash can," dkt. 87-3 at

5, but soundly asleep in her bedroom at that time.  (Trott Decl. ¶ 7; VS Wang Decl. ¶¶ 4–5.)

### 3.    Sulan Wang Interview

Before defendant's interview began, her aunt Sulan Wang was sitting on a couch.  (Wu Decl.

¶ 15.)  After defendant went into the room to begin her interview, SA Wu asked Wang, in English, if SA

Wu and SA Yu could ask Wang a couple of questions and if there was a private place to talk.  *Id.*  Wang,

in English, suggested going upstairs to her bedroom.  *Id.*

Once Wang, SA Wu, and SA Yu arrived in Wang's room, Wang stated that her English was not

very good.  (Wu Decl. ¶ 16; Yu ¶ 6.)  From that point on, SA Wu spoke to her in Chinese, and interpreted into English for SA Yu, who does not speak Chinese.  *Id.*  Near the outset Wang, who appeared very tired during this whole interaction, got onto her bed, and at one point asked if she could go back to sleep.  *Id.*  SA Wu informed her that she could, though she did not ultimately do so at this time.  (Wu Decl. ¶ 16.)  Following this, SA Wu interviewed Wang for approximately fifteen or twenty minutes in Chinese.  (Wu Decl. ¶ 16; Yu ¶ 6.)

SA Yu stayed with Wang after the interview, exchanging small talk in English.  (Wu Decl. ¶ 17; Yu ¶¶ 6–7.)  Once Wang said she needed to get ready for work, SA Yu quickly confirmed; SA Yu kept the door slightly open while Wang got ready pursuant to FBI operating procedures.  (Yu ¶ 8.)  Wang got ready for work, including going downstairs to pack for lunch.  *Id.*

During this time, Wang went to get something from the garage, where she encountered SA Thomas and SSA Trott searching the garage.  (Thomas Decl. ¶ 7; Trott Decl. ¶ 9.)  SA Thomas and SSA Trott asked if defendant's belongings were in the garage, and Wang helpfully indicated that the items in the garage related to Wang's ex-husband rather than defendant.  *Id.*  Wang left the garage, went back into the house and prepared something in the kitchen.  The agents observed Wang appeared quiet, calm, collected, and not emotional during the exchange.  *Id.*

Wang told defendant that she was leaving in what sounded like a casual exchange.  Neither sounded distressed.  (VS Wang Decl. ¶ 5.)  Before Wang departed for work, SA Wu also asked, in Chinese, if the agents could search Wang's car before Wang left.  (Wu Decl. ¶ 17; Yu Decl. ¶ 10.)  SAs Wu and Yu showed Wang a consent form, written in English, but SA Wu explained to Wang in Chinese that the form gave the FBI consent to search Wang's car; that Wang was not required to consent; and that, even if she consented, Wang could revoke her consent at any time.  *Id.*  Wang agreed and signed the form.  *Id.*  Dkt. 87-2 at 92–93.  After agents briefly searched Wang's car, taking less than five minutes and recovering no items, Wang departed for work.  (Wu Decl. ¶ 17; Yu Decl. ¶ 10.)

### 4. Between the Two Sessions of Defendant's Interview

At the conclusion of the initial interview session, defendant went upstairs to get her daughter out of bed.  This is the first time the daughter was awake.  (Trott Decl. ¶ 7; VS Wang Decl. ¶ 4–5.)  Defendant read a book with her daughter.  (VS Wang Decl. ¶ 5.)  Defendant also got her daughter ready

1   in the bedroom and bathroom.  *Id.*  Defendant then brought her daughter downstairs, and set her

2   daughter up at the kitchen counter with an iPad while making breakfast.  (Trott Decl. ¶ 7; VS Wang

3   Decl. ¶¶ 4–5; Yu Decl. ¶ 9.)  VS Wang—unarmed and not an agent—was there during this time and

4   noted that defendant's daughter was calm and focused on her iPad, and appeared unbothered by others

5   present in the home.  (VS Wang Decl. ¶ 6; Yu Decl. ¶ 9.)

6        Defendant and her daughter stayed together in the kitchen for a lengthy period of time while

7   agents completed the search.  (VS Wang Decl. ¶ 7.)  VS Wang took out her own coloring book and

8   wrote along with defendant's daughter.  *Id.*  Defendant eventually began to show her daughter how to

9   play with a toy, and showed VS Wang how to play as well.  *Id.*  The three of them—defendant,

10  defendant's daughter, and VS Wang—exchanged small talk about it while they played together.  *Id.*

### 5.    Second Session of Defendant's Interview

12       Shortly after 9:00 a.m., the search was ending, and the agents were cleaning up.  (Wu Decl.

13  ¶ 18.)  At around this time, SA Wu informed defendant that the agents were almost done, and asked

14  defendant if she was available to talk to the two agents one more time.  (Wu Decl. ¶ 18; VS Wang Decl.

15  ¶ 8.)  Defendant agreed to talk to them again.  Defendant and VS Wang agreed that VS Wang would

16  stay behind to watch her daughter, and they continued playing together.  (VS Wang Decl. ¶¶ 8–9.)

17       SA Fokas and SA Blalock returned to the same room in which the initial interview had been

18  conducted with defendant.  (Blalock Decl. ¶ 5; Fokas Decl. ¶ 4; Wu Decl. ¶ 18.)  At no point was

19  defendant restrained or directed where to go; again the door was closed but not locked.  *Id.*

20       The audio-recording then captures the follow-up interview, which lasted 24 minutes, beginning

21  at around 9:12 a.m. and ending at around 9:36 a.m.  (Ex. C; Ex. E at 41, 60.)  VS Wang stayed with the

22  daughter during that time, playing with her.  (VS Wang Decl. ¶ 9.)  VS Wang did not interview her, but

23  make small talk with the daughter in Chinese to keep the daughter comfortable, asking her about things

24  like school or clothes.  *Id.*

25       SA Fokas began the interview by asking how defendant's daughter was doing, and defendant

26  said "I think she's okay because I'm-I-I didn't tell her what happened," and "I just let her play."  Dkt.

27  87-2 at 60.  Again the agents repeatedly emphasized the voluntary nature of the interview.  SA Blalock

28  said, near the outset, "So I just – we want to give you – this is your chance to talk to us, right?  And it is

1    up to you whether you want to or not." Dkt. 87-2 at 62.  The follow-up interview then covered various

2    topics, including defendant's former teacher, her funding in the United States, her thoughts about her

3    future career plans, including that she was considering a career change, and how defendant is a "DIY"

4    person who did her travel and visa planning herself.  Dkt. 87-2 at 63–74.  After all of this, defendant

5    again stated that she was no longer affiliated with the military.  Dkt. 87-2 at 76.

6        At the end of the interview, defendant's daughter was still quietly in the kitchen, playing with VS

7    Wang.  (VS Wang Decl. ¶ 9.)  But defendant's demeanor changed after the end of the second interview

8    session, and she sternly told VS Wang, in English, not to talk to her daughter.  (Hernandez Decl. ¶ 6; VS

9    Wang Decl. ¶ 9.)

10        **6.    Atmosphere of Search and Interview**

11        The agents present at the search, having experience in hundreds of search warrant executions,

12    repeatedly characterize the search and interview on July 13, 2020 as a calm, collected, and low-intensity

13    affair.  (Blalock Decl. ¶ 8; Fokas Decl. ¶ 7; Hernandez Decl. ¶ 6; Thomas Decl. ¶¶ 6–7; Trott Decl.

14    ¶¶ 6–9; Wu Decl. ¶ 11, 13; Yu Decl. ¶¶ 6–9; VS Wang Decl. ¶¶ 4–6.)  None of the three occupants of

15    the house—defendant, her daughter (who was asleep for a large portion of the time), or Wang—

16    appeared upset, agitated, or under any pressure throughout the entire search, up until the conclusion of

17    the second session of the interview, when defendant spoke sternly with VS Wang not to talk to her

18    daughter.  (*Id.*; Hernandez Decl. ¶ 6; VS Wang Decl. ¶ 9.)  Indeed, VS Wang, who participates regularly

19    in searches as a victim specialist to put non-offending household members at ease, emphasized the

20    respectful nature of this search, particularly with respect to defendant's sleeping daughter.  (VS Wang

21    Decl. ¶ 4.)

22        Meanwhile, defendant's interview involved two agents in business suits, without visible

23    firearms, in a bedroom of her home while other agents searched various corners of the house.  (Blalock

24    Decl. ¶¶ 4–5; Fokas Decl. 3–4.)  Defendant laughed throughout the interview with the agents at least 10

25    times, if not more.  (*See, e.g.*, Ex. E at 8, 17, 20, 42, 44, 49, 50, 53.)

26    **III.    ARGUMENT**

27        **A.    Legal Background**

28        A person who "has been taken into custody or otherwise deprived of his freedom of action in any

significant way," must receive warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), prior to questioning.  But "[a]n officer's obligation to administer *Miranda* warnings attaches only where there has been such a restriction on a person's freedom as to render him in custody.  Whether a suspect is in custody turns on whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position."  *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (quotations and citations omitted); *see also Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (custody inquiry is whether "a reasonable person would have felt that he or she was at liberty to terminate the interrogation and leave").

The inquiry is an objective one and asks how a reasonable person in the subject's position would regard his situation.  *Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam).  In the Ninth Circuit, general "[f]actors relevant to whether an accused is 'in custody' include the following: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual."  *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001).

As for questioning within a subject's home, "courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature.  The element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings."  *United States v. Craighead*, 539 F.3d 1073, 1083 (2008) ("An interrogation conducted within the suspect's home is not *per se* custodial.")  Nonetheless, the Ninth Circuit has "identified four relevant considerations in determining whether an interrogation at a defendant's home was custodial: '(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.'"  *United States v. Quackenbush*, 728 F. App'x 777, 778 (9th Cir. 2018) (unpublished disposition) (citing *Craighead*, 539 F.3d at 1084).

While the Ninth Circuit has not explicitly decided the question other whether the defendant bears

1    the burden of proving she was in custody in the *Miranda* analysis, other circuits have held so and the

2    general rule is the burden falls on a party seeking suppression.[2]

3    **B.    Defendant's Motion Lacks Factual Support**

4    As an initial matter, defendant's Motion lacks factual support for the relief she seeks—it fails to

5    even attach the actual audio-recordings of the interview sessions defendant is seeking to exclude, which

6    demonstrate the non-custodial nature and voluntariness of the calm, low-intensity interviews.  It

7    provides almost none of the context around the interview sessions, and no support from any statements

8    of defendant to establish a basis for her requested relief, despite attempted assertions by defense counsel

9    that cannot replace actual statements by defendant herself.[3]  Rather, defendant's motion is solely

10   supported by the declaration of her aunt Sulan Wang, a declaration from a defense attorney who was not

11   present the day of the search and arrest, one version of a transcript of the interview, and three

12   documents—one of which clearly describes a different operation, days later than the July 13, 2020

13   search related to defendant's eventual arrest (Exhibit E to the Motion, as further described below).

14   As a result, the Motion is replete with omissions that, if included, would have accurately

15   described the actual events of the day and demonstrated the non-custodial nature of the defendant's

16   interview sessions.  Indeed, the declaration of one of defendant's four defense attorneys, apparently in

17   the place of the actual recordings, fails to describe fundamental aspects of the interview—such as

18   defendant's obvious ability from the recordings to communicate in English, calm demeanor, and her

19   laughter throughout—all while omitting the actual reason for the one time defendant becomes emotional

20   during both interview sessions (that is, the effects of the COVID-19 pandemic on her a working parent).

21   Moreover, Sulan Wang was not a witness to a substantial number of the events described above,

22   including the initial interactions between defendant and the agents inside the house; the entirety of

23

24   [2] "[T]he Ninth Circuit has never decided which side bears the initial burden of proving custody
     or a lack of custody."  *United States v. Paiz*, No. 06-00710-WHA, 2007 WL 1052891, at *3 n.2 (N.D.
25   Cal. Apr. 5, 2007); *accord United States v. Hayes*, No. 13-00085-JD, 2014 WL 5408425, at *3 (N.D.
     Cal. Oct. 22, 2014).  Opinions issued from other circuits, however, have found that a defendant bears the
26   burden of proving he was in custody at the time incriminating statements were made.  *See, e.g.*, *United
     States v. Davis*, 792 F.2d 1299, 1308–09 (5th Cir. 1986).  Moreover, the general rule is that the burden
27   of production and persuasion falls on the party seeking suppression.  *See, e.g.*, *United States v.
     Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980); *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986).

28   [3] *See, e.g.*, Mot. at 10 ("Dr. Song is a Chinese national, with limited exposure to American
     constitutional concepts or law enforcement practices, and who does not speak English fluently.")

1   defendant's interviews; and everything that happened after Wang left for work at what she estimates to

2   be 7:30 a.m.  Dkt. 87-3 at 3.  Despite Wang having witnessed a minimal number of the relevant events

3   on July 13, 2020 and her relatively quick departure from the house before the second session of

4   defendant's interview even began, there are additional references in her declaration that do not reflect

5   the calm nature of the search warrant execution set forth in all of the attached agent declarations.

6   Instead, it is possible that she may be mistakenly confusing the events of the interview and search on

7   July 13, 2020, with the events of July 18, 2020, when FBI agents returned to the residence five days

8   after the search with an arrest warrant to bring defendant into custody (and which is not the subject of

9   the Motion).

10      Defendant's Motion is also demonstrably incorrect on the facts.  For instance, the Motion

11   repeatedly claims that "nine armed FBI agents conducted a dawn raid" (*see, e.g.*, Mot. at 1, 2, 10), but as

12   explained above, there were eight total agents present on July 13, 2020, only six of which actually

13   participated in the entry and execution of the search warrant, and the ninth individual was a Chinese-

14   speaking Victim Specialist, who was not armed, did not come to the house until it was cleared, and was

15   specifically there to help comfort defendant's young daughter.  The two other agents, dressed in

16   business attire and without visible weapons, remained in the car until defendant agreed to be interviewed

17   and they came into the house.

18      The motion also asserts that "The FBI knew that [defendant] and her family posed them no

19   danger.  This was not the arrest of an armed and violent criminal," (Mot. at 1), and uses this to criticize

20   the FBI's standard safety protocol of knocking-and-announcing (generally required by law) and quickly

21   conducting a protective sweep for safety, as though doing so were somehow unusual or excessive.  The

22   motion later cites to Exhibit E to the Bernstein Declaration, an FBI Form FD-888 dated July 16, 2020

23   which reads "subject is not known to be armed or dangerous."  87-2 at 95.  As an initial matter, this FD-

24   888 was clearly prepared in advance of a different operation—the *arrest* of defendant on July 18, 2020,

25   not the search on July 13, 2020.  In any event, it is irrelevant.  If a subject is known to be "armed and

26   dangerous," the FBI likely would have required a tactical SWAT operation.  (Wu Decl. ¶ 5.)  That a

27   subject is not armed and dangerous *does not mean* that the execution of a search warrant in an unfamiliar

28   location with unknown individuals inside poses agents no danger.  *Id.*  Only months ago, two FBI agents

were murdered and three others were shot by surprise shotgun blasts when they were serving a search

warrant (without a tactical SWAT team) for digital evidence in Sunrise, Florida.[4]  Defendant's

uninformed attempt to second-guess the baseline standard FBI safety protocols utilized in the initial

minutes of this encounter, which are designed to protect *both* those in the home and the agents—raised

in a motion filed weeks after two FBI agents were murdered executing a standard search warrant—

should be rejected.  Indeed, after the protective sweep of the house on July 13, 2020 with Wang and

defendant standing immediately outside, for mere minutes, Wang and defendant re-entered the home

and the FBI employees then entered the house with no firearms ***ever*** unholstered in the house with Wang

and defendant inside for the remainder of the search.

### C.     Defendant's Interview Statements Were Voluntary and Non-Custodial

Defendant was not in custody during voluntary interview sessions on July 13, 2020, at home in

Newark, California in an unlocked bedroom with two FBI agents in business attire without any visible

firearms, bracketed by her trips upstairs to check on her sleeping daughter, while a professionally

executed FBI search pursuant to a federal warrant was conducted elsewhere in the house.

Considering the Ninth Circuit's four relevant considerations to determine the question within a

defendant's home set forth in *Craighead*, 539 F.3d at 1084, as well as the five general factors among

those relevant to deciding the question of custody set forth in *Hayden*, 260 F.3d at 1066, the interview

was clearly not custodial under the totality of the circumstances.  The cases cited by defendant concern

plainly different facts where the defendant was significantly deprived of his or her freedom of action,

which are simply not present here.  No *Miranda* warnings were necessary.

#### 1.     Two Agents in Business Attire Without Visible Firearms Interviewed Defendant While Six Agents Conducted a Professional Search Warrant Execution Elsewhere in the Home

The Motion first argues that "the nine FBI agents conducting the raid created a police-dominated

atmosphere," asserting that "these agents drew firearms, creating a highly visible and real threat of

police force."  Mot. at 9.  But the situation in this case is dramatically different from that than those that

---

[4] "Murders of FBI agents reveal dangers of serving a warrant.  Did agency miss something?" *Miami Herald* (Feb. 2, 2021), *available at* https://www.miamiherald.com/news/local/article248950964.html (last accessed March 28, 2021).

defendant cites.  For example, in *McKany*, officers "swarmed into [defendant's] home at 6:30 a.m. in full tactical gear and with guns drawn," where "eight to ten officers initially entered the house, and fourteen officers were ultimately involved in executing the search warrant"; the defendant "was handcuffed prior to the interrogation, and officers had to help him into a pair of pants while he was handcuffed."  *United States v. McKany*, 649 F. App'x 553, 554–55 (9th Cir. 2016) (unpublished disposition) (emphases added).  In *Craighead*, "eight law enforcement officers, representing three different law enforcement agencies" in which "some wore protective gear, and some of them unholstered their firearms in Craighead's presence" and "[t]he presence of the different agencies led [defendant] to doubt whether [an agent] spoke for all of the agencies."  539 F.3d at 1084–1085 ("if the suspect sees the officers unholstering their weapons within his home, the suspect may reasonably believe that his home is no longer safe from the threat of police force." (emphasis added)).  In *Clymer*, "eleven federal and local law enforcement officers, representing six different agencies … drew their weapons and ordered [defendant] to the ground, forcing him to exit the house by crawling forward in a supine position across the front entryway.  Once outside the residence, [defendant] was handcuffed and detained in a police car."  524 F. App'x 354, 355–56 (9th Cir. 2013) (unpublished disposition).

Here, by contrast, the defendant agreed to be interviewed when asked by an agent with a holstered, not visible firearm—and defendant agreed after she was told she was not under arrest and that the interview was voluntary—before two FBI agents in business suits without any firearms visible spoke with her in an unlocked first-floor bedroom that defendant had agreed on.  And the day could not look any more different than the situations in the cases cited in the Motion.  Unlike *McKany* and *Clymer*, defendant was never handcuffed or restrained, or handled in any way physically.  Unlike *Craighead* and *Clymer*, all of the law enforcement present in this situation belonged to the FBI.  Indeed, the six FBI agents conducting the search outside the bedroom of the interview proceeded professionally and quietly in view of defendant's sleeping daughter.  They never unholstered a firearm after the initial knock-and-announce and protective sweep of the home to clear it for safety while defendant and her aunt Sulan Wang stood outside—all of which took only a matter of minutes after the FBI's approximate 6:00 a.m. arrival.  Only then did the FBI employees enter the house with Wang and defendant to proceed with the search.  And unlike *McKany*, the agents did not wear tactical gear and their "FBI" jackets generally

covered their holstered firearms.  No firearms were ever unholstered in the house with Wang and defendant inside.  *See, e.g.*, *United States v. Acosta-Licerio*, 756 F. App'x 743, 744 (9th Cir. 2019) (unpublished disposition) (not custodial interrogation where "[defendant] was interviewed in his home and the surrounding area by only two law enforcement agents with no visible weapons, [defendant] was not restrained by physical force or by threats, and to the extent he was isolated from others, the record indicates that he chose to speak with the agents alone").

Simply put, as with another analogous situations analyzed by the Ninth Circuit, "the number and appearance of the officers involved in the questioning here made the interview less imposing than the one in *Craighead*.  There were fewer officers involved in the interview in this case.  The officers wore plain clothes rather than uniforms or tactical gear.  And the officers' firearms were concealed and not drawn, whereas officers involved in the interview in *Craighead* unholstered their weapons at various points."  *Quackenbush*, 728 F. App'x at 778–79.

The Motion then argues that "[s]o complete was the FBI's dominance of the home starting at 6:00 a.m. that morning, that the FBI controlled [defendant]'s access to her six-year-old-daughter." (Mot. at 10.)  Again, this is simply not accurate.  The interview was conducted in the first-floor bedroom that defendant agreed to use.  Her daughter in an upstairs bedroom—who defendant freely checked on both immediately before and after the first session of the interview—was soundly asleep, as defendant had requested she remain, throughout the entirety of the 53-minute session.  Defendant then went back upstairs to her daughter's bedroom to wake her up, stayed with her daughter upstairs to get her ready, brought her daughter downstairs while she prepared breakfast in the kitchen, and stayed with her through the preparation of breakfast and distance learning that morning, until the search was nearly complete and defendant voluntarily agreed to be interviewed again.

Along these same lines, *Craighead* considered whether "a large number of law enforcement personnel may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation."  *Craighead*, 539 F.3d at 1084.  Here, while defendant's interview was conducted in the first-floor bedroom, there were numerous other areas of the home that defendant could easily return to conclude the interview (and did); in fact, before the first interview session began she just went upstairs to spend time in two other bedrooms without agents

inside—her daughter's and her own.  And she went right back there after concluding the interview

before proceeding back downstairs to the kitchen to prepare breakfast and play with her daughter.  *See,*

*e.g.*, *United States v. Remy*, 393 F. App'x 427, 429 (9th Cir. 2010) (unpublished disposition) ("[U]nder

the totality of the circumstances (in-home questioning, [defendant's] telephonic contact with his wife

during the interview, the presence of only two agents, the agents did not show their weapons, and a two

hour interview), [defendant] was not in custody when he made the statements.").

Accordingly, with respect to the consideration of "(1) the number of law enforcement personnel

and whether they were armed," *Craighead*, 539 F.3d at 1084, and likewise "(3) the physical

surroundings of the interrogation," *Hayden*, 260 F.3d at 1066, these considerations weigh against a

finding that defendant was in custody during her interview.

### 2.  Defendant Was Not Restrained or Detained by Any Force or Threats

The Motion argues that defendant "was under immense pressure to stay at the house" and that

defendant "had nowhere to go."[5]  (Mot. at 10–12.)  "When law enforcement agents restrain the ability of

the suspect to move—particularly through physical restraints, but also through threats or intimidation—a

suspect may reasonably feel he is subject to police domination within his own home and thus not free to

leave or terminate the interrogation."  *Craighead*, 539 F.3d at 1085.

Not so here.  On July 13, 2020, defendant was not under arrest, never placed in handcuffs or

otherwise restrained, and in fact throughout the events of that day defendant freely moved between

various rooms and areas upstairs and downstairs of the home.  Agents answered the questions posed to

the agents by defendant and her aunt Sulan Wang upon their arrival at the home on the front porch,

inside the house throughout the day.  The Ninth Circuit's recent analysis distinguishing *Craighead* is

equally applicable for the July 13, 2020 interview of defendant: "the interview environment in this case

did not have the military undertone present in *Craighead*.  The defendant in *Craighead* was a member of

the [U.S.] military—as were many of the officers who came to question him, and he was living on an

---

[5] The Motion asserts without any factual basis that defendant "was terrified by the FBI's raid on
her home" that she was "in a state of extreme fear." and that she "was under immense pressure to do
whatever she thought the FBI agents wanted her to do."  (Mot. at 10, 11.)  This attorney argument,
unsupported by any statement from defendant and contravened by the actual facts (including the
recordings of the interview), should be ignored.

1   Air Force base, increasing the likelihood that he would not feel free to leave during questioning.  [Here,

2   defendant] was not a member of the [U.S.] military, and neither were the law enforcement agents who

3   were present during his interview."  *Quackenbush*, 728 F. App'x at 778–79.

4          Moreover, the setting of the interview room was in no way custodial.  Although defendant was

5   "[b]rought into a room with the door closed, all the way or almost all the way, behind her," (Mot. at 12),

6   the unlocked first-floor bedroom that defendant herself agreed to was unlocked and arranged such that

7   defendant could face both agents and they could speak over the bed in the middle the room.  They were

8   all casually seated and no one was blocking the door.  *See, e.g.*, *Quackenbush*, 728 F. App'x at 778

9   ("[Defendant] was far less isolated than the defendant in *Craighead*.  [He] was interviewed in a dark

10  storage room at the back of his house.  … And an armed officer wearing a 'raid vest' stood blocking the

11  closed door.  … Here, … there is no evidence that anyone was barred from entering the apartment.").

12         While the Motion argues that agents "confront[ed] [defendant] with allegations that she was

13  lying and had committed crimes," defendant never actually confessed to anything during the

14  interviews—and it is only that the agents were persistent in giving defendant every opportunity to

15  explain herself.  *See, e.g.*, Dkt. 87-2 at 36 ("So I want to give you the opportunity, I understand why that

16  would be -- it make you nervous to answer that question.  But I'd like to ask it again just to make sure

17  that we are completely clear.  Do you currently have any affiliation to the military or FMMU?  And, if --

18  you know, if you change your answer, that's okay.  And if you don't change your answer, that's fine too.

19  But we need to know.").  This was no situation that *Miranda* was meant to guard against—there was no

20  admission coerced by the interviewers.  To the extent the agents pressed defendant to admit to her

21  crimes by confronting her with evidence of her lies (a factor reasonably present in most law enforcement

22  interviews of someone suspected of a crime), defendant clearly and firmly resisted that pressure and did

23  not do so at all.  Instead, defendant calmly and repeatedly lied to the agents.  The audio recording is

24  clear—defendant was laughing with the agents at least 10 times, controlling the interview the entire

25  time.  This simply belies the argument that the environment was so coercive that she felt like she had to

26  confess in order to leave.  *See, e.g.*, *United States v. Tobie*, 411 F. App'x 995, 996 (9th Cir. 2011) ("The

27  tone of the conversation was quiet and reasonable.  Although officers applied a modest amount of

28  psychological pressure to [defendant] by coming to his house at an early hour and saying that they knew

1  he possessed child pornography, this is insufficient to find that his confession was involuntary. We have

2  held confessions under much more extreme circumstances to be voluntary.").

3      Nor was defendant "detained" at all during the interview, let alone for any extended period of

4  time.  Neither of the voluntary 53-minute or 24 minute interview sessions, separated by a lengthy break

5  in which defendant spending time with her daughter preparing breakfast and attending to distance

6  learning, could be considered "lengthy questioning" that would "weigh[] in favor of finding a finding

7  that a defendant was in custody."  *See United States v. Atkins*, No. 15-cr-00506-BLF-1, 2017 WL

8  2652873, at *9 (N.D. Cal. June 19, 2017) (citing *United States v. Bassignani*, 575 F.3d 879, 886 (9th

9  Cir. 2009)); *see also, e.g.*, *Crawford*, 372 F.3d at 1052, 1059–60 (concluding that the defendant was not

10  in custody when he was interrogated for more than an hour); *Bassignani*, 575 F.3d at 886 (finding a two

11  and a half hour long interrogation "at the high end").

12      Finally, the Motion blatantly mischaracterizes the interview when it asserts that defendant "pled

13  to see her daughter, and the FBI agents discussed amongst themselves whether to give her permission to

14  do so." (Mot. at 11–12.)  As clearly heard on the actual recording of the interview, the agents

15  immediately said yes, and that they just needed to make sure (for the safety of everyone involved) that

16  she would not surprise anyone when she went upstairs—and she went upstairs moments after asking,

17  within less than a minute.

18      In sum, with respect to the consideration of "(2) whether the suspect was at any point restrained,

19  either by physical force or by threats," *Craighead*, 539 F.3d at 1084, and likewise "(4) the duration of

20  the detention" and "(5) the degree of pressure applied to detain the individual," *Hayden*, 260 F.3d at

21  1066, these considerations weigh against a finding that defendant was in custody during her interview.

22  **3.   Defendant Was Never "Isolated" From Her Daughter**

23      The Motion also argues that "[b]efore [defendant] was interrogated, she was separated from her

24  aunt and daughter," asserting that she "was separated from her six-year-old child during both

25  interrogations." (Mot. at 12, 11.)  The cases cited in defendant's motion pertain to very different facts,

26  such as by "keeping the child 'out of sight.'"  Mot. at 10.; *see, e.g.*, *United States v. Mora-Alcaraz*, 986

27  F.3d 1151 (9th Cir. 2021) ("police took physical custody of [defendant]'s seven-year-old son and

28  eventually led him inside a large store and out of [defendant's] sight").

1   To the contrary, defendant was never detained or separated from her family members.  At the

2 outset of the FBI's arrival, defendant asked that the agents be quiet and let her daughter sleep.  She then

3 voluntarily agreed to be interviewed and agreed to do it in a room away where her daughter was soundly

4 sleeping.  Before starting, she immediately asked to check on her daughter upstairs, and she was told of

5 course she could and did for several minutes.  After she finished the initial interview, she immediately

6 went to be with her daughter.  Meanwhile, when defendant's aunt departed for work shortly thereafter,

7 she told defendant that she was leaving in a casual exchange with her—neither defendant nor her aunt

8 sounded distressed—as observed by a Chinese-speaking unarmed victim specialist.  (VS Wang Decl.

9 ¶ 5.)  Defendant went on to spend more than an hour if not nearly two hours with her daughter before

10 agreeing to be interviewed a second time, voluntarily leaving her daughter with Chinese-speaking

11 Victim Specialist Jennifer Wang after teaching VS Wang how to play with a toy with them.  *See, e.g.*,

12 *United States v. Ornelas*, No. SACR 14-00183-CJC, 2016 WL 5422034, at *9 (C.D. Cal. Sep. 27, 2016)

13 ("Defendant's own conduct demonstrated his understanding that he was free to leave.").

14   To the extent defendant conducted the interview without her family members who were in the

15 house, that was entirely her own choice.  As noted repeatedly above, she clearly did not want her

16 sleeping and then distance-learning daughter involved in her interview, and at no point did she seek out

17 or request the presence of her aunt.  Indeed, her aunt, who is a U.S. citizen, has since stated to the FBI

18 that she knew, and had discussed with defendant, that defendant was a member of the PLA.  Defendant's

19 aunt would obviously not have been a helpful presence to defendant in an interview in which defendant

20 repeatedly denied to the FBI any affiliation with the PLA.

21   The Motion also asserts that defendant "was beholden to the FBI agents who controlled the

22 situation and had to cooperate with their directions and questions: The sooner she could satisfy their

23 inquiry, the sooner they might finish and leave, allowing her to be reunited with her terrified daughter."

24 (Mot. at 11.)  But defendant was never separated from her daughter as described above, and her daughter

25 was plainly not terrified.  Indeed, her daughter was asleep for much of the morning.  The victim

26 specialist whose primary responsibility was to watch and comfort the daughter, who played with her and

27 exchanged small talk with her in Chinese, never saw her cry throughout the whole day, observed her

28 reading a book and getting ready with her mother, and described her as "calm" and "unbothered by

others present in the home" as she had breakfast, did distance learning on an iPad, and played.  (VS Wang Decl. ¶ 6.)  In any event, the two agents interviewing defendant made clear that answering their questions had no bearing on when they would complete the search and leave; as the first session of the interview ended they said they'd "step away" but would remain nearby and that the other agents would continue the search, and defendant was "welcome to leave, welcome to stay" and that they were happy to return to talk more.  Dkt. 87-2 at 48–49.

In fact, there is absolutely no suggestion that defendant wanted to go somewhere else during the interview sessions while her daughter was soundly sleeping upstairs (who defendant freely checked on both immediately before and after the first session of the interview), or while she was doing distance learning or playing in the kitchen just outside (after defendant had just spent more than an hour with her in the kitchen having breakfast and playing after the first interview session).  Indeed, as the second session began, defendant even remarked that her daughter was "okay because [she] didn't tell her what happened" and "just let her play"—demonstrating the complete opposite of wanting her daughter to be there with her during the interview.

The consideration of "(3) whether the suspect was isolated from others," *Craighead*, 539 F.3d at 1084, weighs against a finding that defendant was in custody during her interview.

### 4.   Agents Repeatedly Informed Defendant She Was Not Under Arrest and Any Interview Was Voluntary

Finally, while the Motion acknowledges that agents told defendant that "she was not under arrest and, later, that she could leave," the Motion still argues that "agents only made these statement [sic] after much of the first interrogation was already over" and asserts that "indications that [defendant] was not under arrest or could leave do not vary the custodial nature of the interrogations."  (Mot. at 13.)

As an initial matter, the Motion is completely wrong that agents only informed her of this partly through the first interview session.  In fact, defendant was told she was not under arrest or in custody at least five times, including once before the interview began and multiple times during the interview, and informed that the interview was voluntary at least three times, including once before the interview began and multiple times during the interview.  *See* Section II.B.1 (citing Wu Decl. ¶ 13) and II.B.2.

Indeed, defendant agreed to be interviewed, confirming this even after she was informed she was

not under arrest, and after she was advised she was not required to speak with the FBI after she stated on her own that she had rights.  Defendant then agreed to be interviewed in a second session again after the first session, after she was told multiple times throughout that any interview was voluntary and she was free to go.  *See, e.g.*, Dkt. 87-2 at 42 ("Make something very, very clear.  You're not under arrest. That's not why we're here, okay."); *id.* at 45 ("If we were arresting you, you would have – if we were arresting you, the first thing we would have said to you is – we would have read you your rights."); *id.* at 45 ("This is completely voluntary.  You do not have to talk to us right now.  That's fine.  And if that's what you want to do, that would be fine."); *id.* at 46 ("It is up to you whether you want to talk or not. We're not forcing you to.  Like Spiro said, it is voluntary."); *id.* at 48 ("So you are under no obligation to talk to us.  You are not under arrest, you are not."); *id.* at 45 (Defendant: "I just want to know my rights.  I mean, this is not arrest.  I think I have some personal rights, right? … Including keep silent. Right?"); *id.* at 48–49 ("You are, like I said, welcome to leave, welcome to stay.").

Once again, the Ninth Circuit's recent analysis distinguishing *Craighead* is equally applicable for the July 13, 2020 interview of defendant: "We observed in *Craighead* that although the defendant was told he was free to go, the circumstances of the interview and number of different agencies involved in the search of his home left the defendant justifiably concerned that the one officer who told him that he was not under arrest and that his statements were voluntary did not speak for the other officers. There was no such cause for concern here."  *Quackenbush*, 728 F. App'x at 778–79.  For the reasons above, there is no such cause for concern regarding the July 13, 2020 interview of defendant as well.

Accordingly, with respect to the consideration of "(4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made," *Craighead*, 539 F.3d at 1084, and "(1) the language used to summon the individual," *Hayden*, 260 F.3d at 1066, these factors again confirm that defendant was not in custody during her interview.

## IV.  CONCLUSION

Under the totality of the circumstances in consideration of each of the factors set forth by the Ninth Circuit, defendant was not in custody while interviewed by agents on July 13, 2020.  Defendant's Motion fails to provide legitimate factual support to sustain its motion.  Indeed, it is not a close call. There is no basis for further inquiry, let alone an evidentiary hearing.   For the foregoing reasons,

defendant's Motion to exclude statements made in her July 13, 2020 interview should be denied, and her request for an evidentiary hearing should also be denied.

Dated: April 30, 2021

STEPHANIE M. HINDS
Acting United States Attorney


 /s/
BENJAMIN KINGSLEY
ERIC CHENG
Assistant United States Attorneys