UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>CHEN SONG,<br><br>    Defendant. | No. CR 21-00011 WHA<br><br>**ORDER RE MOTION IN LIMINE TO EXCLUDE JULY 13, 2020 FBI INTERVIEW, REQUEST TO SUBMIT SUPPLEMENTAL AUTHORITY, MOTION TO STRIKE, AND REQUEST FOR AN EVIDENTIARY HEARING.** |

**INTRODUCTION**

On July 13, 2020, the FBI detained defendant on the porch of her home while agents swept inside, with at least one gun pointed at the house. Her then-six-year-old daughter slept upstairs, alone. Two interviews with defendant inside the home followed. A superseding indictment alleges visa fraud and lying to the FBI, among other charges. Defendant contends that the July 13 interviews were custodial and that agents should have *Mirandized* her. This order agrees. The motion to suppress her statements is **GRANTED**.

**STATEMENT**

At six a.m., nine FBI personnel pulled up to Dr. Chen Song's home in Newark to execute a search warrant. Six special agents wore FBI-emblazoned windbreakers and body-armor

1  vests. Those six announced themselves by yelling "FBI" and knocking loudly on the front
2  door. Dr. Song's aunt, Sulan Wang (the homeowner), answered the door. Special Agents
3  (SAs) Geoffrey Thomas and Leticia Wu drew their firearms for this "initial knock-and-
4  announce;" SA Wu pointed hers at the house (Thomas Decl. ¶ 4; Wu Decl. ¶ 3).

5  Next, SA Wu ordered Sulan Wang out of the house and Dr. Song appeared on the interior
6  stairs. SA Thomas, holding an unholstered gun, gestured for her to come outside. SA Wu
7  positioned herself between the front door on one side, and Dr. Song and Sulan Wang on the
8  other. A number of agents drew their firearms and entered the home to perform a "security
9  sweep." They found the six-year-old upstairs, apparently asleep. After the security sweep,
10 agents directed Dr. Song and Sulan Wang inside. SAs Spiro Fokas and Joyce Blalock also
11 came inside. The pair wore suits, which covered their holstered guns (Yu Decl. ¶¶ 4–6; Wu
12 Decl. ¶¶ 3, 4–7, 9; Hernandez Decl. ¶ 4).

13 FBI Victim Specialist (VS) Jennifer Wang also attended. VS Wang, who spoke fluent
14 Mandarin, "was the FBI employee primarily responsible for keeping watch of the daughter."
15 According to the Law Enforcement Operations Order for this search, if probable cause
16 developed to arrest Dr. Song, VS Wang would remain with her daughter until childcare could
17 be arranged. No arrest warrant for Dr. Song existed as of this search (Wang Decl. ¶ 3;
18 Bernstein Reply Decl. Exh. 1 at 11).

19 Shortly after entering the home, SAs Fokas and Blalock started an audio recording. The
20 recording captured SA Fokas addressing Dr. Song: "I was wondering if we could go
21 somewhere and talk uh, talk privately. Is there an area uh – we're gonna be around here
22 conducting a search so it might be kind of busy. So a place where we could speak to you uh,
23 privately, I think, would be better." Dr. Song asked to check on her daughter first, which SAs
24 Fokas and Blalock permitted. SA Wu followed Dr. Song to the second floor and waited
25 outside the open doorway of the child's room (Cheng Decl. Exh. D at 2–3; Wu Decl. ¶¶ 9–13;
26 Blalock Decl. ¶ 5; Fokas Decl. ¶ 4).

27 SA Wu then stood in the open door of Dr. Song's room while she changed. SA Wu
28 declares that she told Dr. Song, in Mandarin, that Dr. Song was not under arrest and was not

required to speak to agents but that "it might be helpful." SA Wu did not tell Dr. Song that she was free to leave. While SA Wu declares that she spoke to Dr. Song in "Mandarin Chinese," nothing reveals her degree of fluency or her exact wording (Wu Decl. ¶¶ 9–13).

After Dr. Song returned downstairs, SA Fokas directed Dr. Song into a first-floor bedroom. The agents sat on chairs on one side of the bed and Dr. Song on a chair on the other side. At the May 25 hearing, the government conceded that SA Blalock sat in front of and closest to the door, which was closed but not locked. SA Blalock never stood, however, "to block defendant's exit" (Cheng Decl. Exh. D at 3; Blalock Decl. ¶ 5; Fokas Decl. ¶ 4).

The agents recorded the entire interview, which began at 6:18 a.m. The transcript reflects occasional laughter during the interview. The overall tone was calm. At the outset of the interview, the agents informed Dr. Song that they believed other Chinese academics had made false statements to obtain visas. They next asked her about her career and soon SA Blalock brought up the address Dr. Song reported on her visa application: "[I]t's the same address as [the] PLA Air Force General Hospital in Beijing . . . . If you have no affiliation at all, then why would it be at the PLA Air Force Hospital?" Dr. Song responded, "I need to know what kind of rights I have. Because in the morning, I-I'm a little bit scared." Shortly thereafter, approximately forty-five minutes into the interview, the agents told Dr. Song several times that she was not under arrest and did not need to speak with them. Directly afterwards, SA Fokas told Dr. Song that he suspected she had committed another crime:

> So, you are under no obligation to talk to us. You are not under arrest. You are not. But, based on what you told us now, based on where we are with, kind of, this revelation, I do think you're lying to us. And lying to an FBI agent is a crime. Okay? That is a crime . . . . We'll have to come back at some point in time and clear that up . . . . So it's up to you, it really is.

At approximately minute fifty-eight (out of the interview's total sixty-seven), agents told Dr. Song that she was, "Welcome to leave, welcome to stay" (Cheng Decl. Exh. D at 35, 38–39, 41; Cheng Decl. Exh. A at 58:12).

At the end of the interview, SA Fokas told Dr. Song: "[W]e'll go through all that information that we collect, and look to see if there's any other information which suggests that you have-you've been dishonest with us . . . . Uhm, and at that point, we'll figure out what comes next. Right?" He added, "Either-either come back and talk to you, or uhm, if there's gonna be criminal charges or something like that." Dr. Song responded, "I hope next time, would you please just knock the bell, because I'm so afraid-so afraid for . . . my daughter." Agents responded affirmatively. The interview ended at 7:11 a.m. (Cheng Decl. Exh. D at 41–43).

Dr. Song next asked to check on her daughter. SA Fokas told her to wait until he informed other agents that Dr. Song would be going upstairs. This would prevent "surprise" (Blalock Decl. ¶ 5; Fokas Decl. ¶ 4; Cheng Decl. Exh. D at 43).

Meanwhile, during Dr. Song's interview, and outside Dr. Song's presence, Sulan Wang had asked to use the bathroom. Agents allowed her to do so but only with the door open. Sulan Wang also asked to go to work, which agents allowed after first asking to search and searching her car. Also throughout Dr. Song's first interview, VS Wang observed the six-year-old through the child's partially-opened bedroom door. Finally, at an unspecified point in time, a neighbor emerged, identified himself to agent(s) as a lawyer, and complimented agents on their proper conduct (Wu Decl. ¶ 17; Sulan Wang Decl. ¶ 9; VS Wang. Decl. ¶ 3; *see, e.g.*, Hernandez Decl. ¶ 5).

After Dr. Song received permission, she proceeded upstairs to check on her daughter. VS Wang observed Dr. Song waking the child, dressing her, and bringing her downstairs to the kitchen. Dr. Song set her up for distance learning on an iPad. SA Mindy Yu also "observed" the doctor and her daughter in the kitchen. VS Wang stayed "three or four steps" away and then sat at the kitchen table with the pair. The three remained in the kitchen for about an hour and a half. The other SAs also remained in the home (Yu Decl. ¶ 9; VS Wang Decl. ¶¶ 6–8).

Shortly after nine, agents asked Dr. Song to interview again. She again accompanied them into the first-floor bedroom. VS Wang continued minding the six-year old in the kitchen (VS Wang Decl. ¶¶ 6–8).

The second interview began at 9:12 a.m. and lasted twenty-three minutes. SAs Fokas and Blalock again kept their weapons hidden and holstered. They continued to question Dr. Song about her career and ties to the Chinese military. For example, the agents presented her with a photograph of herself in a military uniform (Cheng Decl. Exh. E at 55):

> JB: Is that photo a picture of you? Do you recognize that?
>
> SC: I think better to keep silent [*sic*].
>
> JB: It's-it's-it's just a yes or no.
>
> SC: I know.
>
> JB: Of your photo.
>
> SF: Miss Song, it's ok. We know that it's you.
>
> JB: I mean where we got it is all over the internet. Like you used it as your profile picture everywhere.

After additional exchanges, SA Blalock said, "[Y]ou're obviously still affiliated with the military." Later, SA Fokas added, "We've given you opportunities to explain and you-you refuse to do so . . . . That makes it hard for- we-we-we can't let that go. We can't. It's-I told you it's a crime to lie to the FBI" (*id.* at 55, 57).

At no time did Dr. Song request permission to leave the home, with or without her daughter. At no time did agents use handcuffs (Yu Decl. ¶ 4).

A superseding indictment from February 2021 charged Dr. Song with:

- Count One, visa fraud, in violation of 18 U.S.C. § 1546(a);
- Count Two, obstruction of official proceedings, in violation of 18 U.S.C. § 1512(c)(2);
- Counts Three and Four, alteration or destruction of records, in violation of 18 U.S.C. § 1512(c)(1)); and
- Count Five, false statements to a government agency, in violation of 18 U.S.C. § 1001(a)(2).

Statements that Dr. Song made in these two interviews form the basis of Count Five. This order follows full briefing, in-person oral argument, and supplemental briefing.

**ANALYSIS**

1. **CUSTODIAL INTERROGATION.**

The FBI deprived Dr. Song of freedom of action in a significant way, such that a reasonable person would not have felt free to terminate her interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). District courts weigh four factors when evaluating the custodial nature of interrogations that take place inside defendants' homes. *See United States v. Craighead*, 539 F.3d 1073, 1083 (2008). The "nonexhaustive" factors aim to establish whether the interrogation occurred in a "police-dominated" atmosphere, or not. *Id.* at 1084.

*First*, "the number of law enforcement personnel and whether they were armed" tends to show police domination of the home. *Ibid.* Here, nine FBI staff arrived; six agents drew their weapons and at least one pointed a gun at the house. The *Craighead* decision cited other cases that had found eight, seven, and five officers sufficient to dominate a home when only some of those officers had guns. The *Craighead* decision held that eight officers from three different agencies indicated a custodial setting. The law enforcement personnel present here would have suggested to any reasonable person that the "home [was] no longer safe from the threat of police force." *Ibid.*

*Second*, "whether the defendant was restrained physically or with threats" weighs in favor of the motion. *Id.* at 1085. At the onset of the raid, agents directed Dr. Song outside. Officers with guns drawn searched her house while her six-year-old slept upstairs, alone. SA Wu stood between Dr. Song and the house. Her six-year-old daughter remained upstairs, alone. This, too, restrained Dr. Song and set the tone for the remainder of the encounter. During the interviews, an agent positioned herself between Dr. Song and the exit to the bedroom, a move that *Craighead* identified as a form of physical restraint. *Id.* at 1086. *Craighead* also called out "escorting and monitoring" as a form of physical control. *Id.* at 1085, citing *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007). One or more agents appear to have accompanied Dr. Song and remained nearby the bedrooms' open doors

while she went to check on her daughter and while she changed clothes in her own bedroom. FBI personnel also accompanied her into the kitchen with her daughter.

While Dr. Song's subjective impression of her own restraint cannot control the custody inquiry, it can illuminate the objective degree of "police domination" occurring in the home. Dr. Song asked for permission each time she went to her daughter. On one occasion, officers even explained that she should wait briefly so as not to surprise the other (armed) agents. The requests for permission, instructions, and the background threat of violence all point to restraint. Agents maintained physical control, albeit calmly.

*Third*, agents "isolated" Dr. Song from others during the interview. This heavily favors the motion. *Craighead*, 539 F.3d at 1086. The *Miranda* decision emphasized isolation as "perhaps the crucial factor" in provoking self-incrimination. *Ibid*. at 1086–87, citing *Miranda*, 384 U.S. at 445–46, 449–50. Here, the agents, not Dr. Song, proposed a private interview. Specifically, SA Fokas said, "Let's just sit in here and chat," presumably indicating the bedroom where the ensuing interview occurred (Cheng Decl. Exh. D at 2, 3).

*Fourth*, district courts examine whether a suspect "was informed he was free to leave or terminate the interview, and the context." *Craighead*, 539 F.3d at 1084. While this factor could tip the scales, our court of appeals has only called it "perhaps most significant for resolving the question of custody" when discussing interrogations at an FBI office. *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004). Here, agents told Dr. Song at least four times that she was free to remain silent. But agents told her only once that she was welcome to *leave*. They waited until the end of the first interview to do so.

As for context, the special agents all worked for just one agency, in contrast to the three agencies in *Craighead*. Craighead might have doubted, reasonably, that a single officer spoke for all three agencies when that officer said he was free to leave. That concern does not apply here. Still, Dr. Song's home held more law enforcement personnel than did Craighead's. Some agents had guns drawn at the start. Like Craighead, Dr. Song could not escape to her home, the location to which a suspect usually retreats. These facts weakened the effect of an admonition about her freedom to leave. *See Craighead*, 539 F.3d at 1088.

7

Even if the admonition at the end of the first interview that Dr. Song was "welcome to leave, welcome to stay," outweighed the other *Craighead* factors and tended to make Dr. Song's home a non-custodial setting, *Missouri v. Seibert*, 542 U.S. 600, 617–18 (2004), favors the motion. In that decision, the suspect gave an un-*Mirandized* custodial confession, officers then *Mirandized* the defendant, and he confessed again. The Supreme Court held that the coercive effect of failing to *Mirandize* prior to the first confession poisoned the latter. Both confessions were suppressed. *See ibid*.

Of course, the facts of *Seibert* differ significantly from ours. *First*, Mr. Seibert confessed while in the police station. Since he was plainly in custody, the Supreme Court did not decide how an admonition about freedom to leave affected his custody status. *Second*, while Dr. Song did not confess, Mr. Seibert did. Both in *Seibert* and here, however, the goal of preventing "coerced" statements carries equal force. *Ibid*. Since most *Craighead* factors point to a custodial setting, and the admonition about Dr. Song's freedom to leave came at the end of the first interrogation, Dr. Song was more vulnerable to coercion during the first fifty-eight minutes of her interview, which totaled just sixty-seven minutes. Assuming, *arguendo*, the late-given admonition about freedom to leave would tip the *Craighead* factors in favor of non-custody, *Seibert* instructs that an interrogee cannot easily change course from her pre-*Mirandized* statements. Telling Dr. Song that she was "welcome to leave, welcome to stay," likewise did not wipe the slate clean. The taint of compulsion lingered during Dr. Song's second interview.

Here, the *Craighead* factors favor a police-dominated environment. The inquiry does not end there, however. In addition to factors governing home interrogations, our court of appeals has issued five general factors for determining whether any situation amounted to custodial interrogation. *See United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001).

*First*, "the language used to summon the individual" was the initial command for Dr. Song to leave her home. *Ibid*. This weighs against the government because the encounter began with some officers holding guns and some issuing commands, which Dr. Song obeyed.

*Second*, the "extent to which defendant [wa]s confronted with evidence of guilt" weighs in favor of the motion. *Ibid*. Agents informed Dr. Song about their investigations into other academics' illegal conduct. They presented Dr. Song with examples of her putative guilt, including questions and documentation related to her association with the PLA. It culminated in this exchange during the second interrogation: about the address Dr. Song put for down for her visa application, an agent said, "It's the same address as [the] PLA Air Force General Hospital in Beijing . . . . If you have no affiliation at all, then why would it be at the PLA Air Force Hospital?" Dr. Song responded, "I need to know what kind of rights I have" (Cheng Decl. Exh. D at 35).

*Third*, the "physical surroundings of the interrogation," cut both ways. *Hayden*, 260 F.3d at 1066. On the one hand it was her home. On the other, SA Blalock sat closest to the door.

*Fourth*, length of the interrogation, does not weigh heavily either way. *See ibid*. The whole encounter lasted about three hours, and the two interrogations together amounted to approximately eighty minutes.

*Fifth*, the "degree of pressure applied to detain the individual" favors Dr. Song. *Ibid*. In *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir.), *modified*, 830 F.2d 127 (9th Cir. 1987), our court of appeals found "psychological restraints" in the form of "repeated[]" accusations "of lying" and, among other tactics, "insisting on the 'truth' until [defendant] told them what they sought . . . ." *Ibid.* In so doing, "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *Ibid*. Agents' insistence that Dr. Song tell the truth, along with the implication that criminal charges could follow if she did not cooperate, substantially pressured Dr. Song to stay.

Two other considerations suggest custodial interrogation. Agents kept Dr. Song's daughter a floor away, out of sight, during the first interview. During the second, the child sat in the kitchen with VS Wang and armed agents stayed nearby. Any reasonable parent would have felt she could not leave. *See United States v. Mora-Alcaraz*, 986 F.3d 1151, 1156–57 (9th Cir. 2021).

9

Our court of appeals has also emphasized practical considerations in evaluating a reasonable person's perceived freedom to leave. In *United States v. McKany*, 649 F. App'x 553, 555 (9th Cir. 2016), our court of appeals noted that police occupation of a home may gut the admonition, "You are free to leave." *Ibid*., citing *Craighead*, 539 F.3d at 1083. She was free to go where? Home? The subject was already home. Here, the early morning hour, the six-year-old, and a COVID shelter-in-place order eliminated most options for retreat elsewhere.

Finally, this order cannot and will not consider the irrelevant hearsay observations of a lawyer-neighbor who saw the raid and believed it was "proper."

This order finds that agents conducted two custodial interrogations on July 13.

### 2. ADMISSIBILITY OF STATEMENTS AS "INDEPENDENT CRIMES."

The government contends that statements made during the interviews constituted independent crimes and are admissible. The defense moves to strike the government's argument, which the government raised in a post-hearing brief (Dkt. No. 121). But the defense opened the door to the argument by requesting to submit supplemental authority relevant to this point (Dkt. No. 125). The request to submit supplemental authority is **GRANTED**. The motion to strike is **DENIED**. The defense's further supplemental brief on this topic requests an evidentiary hearing, but it does not develop the request. Since no fact dispute appears, the request is **DENIED**.

The government relies on our court of appeals' decision in *United States v. Mitchell*, 812 F.2d 1250 (9th Cir. 1987), a case that did not interpret *Miranda*. In it:

> Agent Colter introduced himself to Mitchell upon arriving at the airport . . . . Mitchell immediately responded by making present, new threats against the President . . . . Mitchell was in no way pressured or induced to make the new threat against the President. He committed the offense "knowingly and willingly."

*Id.* at 1254–55. An indictment charged Mitchell for these threats alone and he moved to suppress. The district court deemed the arrest unlawful but did not reach the issue of custodial interrogation. The government also relies on *United States v. Gordon*, 974 F.2d 1110, 1116

10

1  (9th Cir. 1987), which interpreted *Miranda* and *Mitchell* to hold that the failure to *Mirandize*

2  could not bar prosecution for verbal threats Gordon made during an interrogation.

3      Those cases differ meaningfully from our facts. Dr. Song instead more resembles a

4  defendant in custody of the Immigration and Naturalization Service whose allegedly false

5  statements were suppressed. *See United States v. Chen*, 439 F.3d 1037, 1043 (9th Cir. 2006).

6  Our court of appeals' logic in *Chen* tracks the issues here: Dr. Song was suspected of a crime,

7  she "was believed to have committed that crime, [s]he was in custody because of [FBI] agents'

8  suspicion that [s]he had committed that crime, and the [agents'] questions related to that

9  crime." *Id*. at 1040.

10      Moreover, even if *Mitchell* sanctioned admitting Dr. Song's alleged lies to support Count

11  Five (false statements), her statements would remain inadmissible with respect to Count One

12  (visa fraud). We cannot admit evidence as to one count and suppress it as to another.

### CONCLUSION

The gist of this long analysis is that the FBI swarmed Dr. Song's home with guns drawn, minded the six-year-old daughter throughout the approximately three hours, and twice interrogated Dr. Song in a closed room. The government should have *Mirandized* her. The motion is **GRANTED**. Dr. Song's statements from the 6:18 and 9:23 a.m. interviews are **SUPPRESSED**.

**IT IS SO ORDERED.**

Dated: June 22, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE